# In the United States Court of Federal Claims

No. 02-1627 V

(E-Filed under seal:  February 10, 2009)[1]

(E-Filed for publication:  March 2, 2009)

| | |
|---|---|
| CHRISTOPHER SABELLA, | ) |
| | ) Motion for Review; National |
| | ) Vaccine Injury Compensation |
| Petitioner, | ) Program; 42 U.S.C. § 300aa- |
| | ) 12(e)(2); Reasonable Attorneys' |
| | ) Fees; 42 U.S.C. § 300aa-15(e)(1) |
| v. | ) |
| | ) |
| SECRETARY OF THE DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, | ) |
| | ) |
| Respondent. | ) |
| | ) |

Clifford J. Shoemaker, Vienna, VA, for petitioner.

Michael P. Milmoe, with whom were Gregory G. Katsas, Assistant Attorney General, Timothy P. Garren, Director, Vincent J. Matanoski, Acting Deputy Director, and Catharine E. Reeves, Assistant Director, Torts Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent.

OPINION

HEWITT, Judge

## I.    Background

Petitioner Christopher Sabella filed a petition in the Vaccine Program at the United States Court of Federal Claims on November 18, 2002 seeking compensation for injuries allegedly caused by the administration of the hepatitis B vaccine to him on November 18, 1999, December 24, 1999, and February 7, 2000.  Sabella v. Sec'y of Health & Human

---

[1]When this Opinion was e-filed under seal on February 10, 2009, the court afforded the opportunity to either party to request, by motion, "that redactions be made in the published version of this Opinion."  Neither party requested a redaction.

Servs. (Sabella), No. 02-1627V, 2008 WL 4426040, at *1 (Fed. Cl. Spec. Mstr. Sept. 23, 2008).  The parties were able to resolve the dispute before the case was decided on the merits and "[a] decision adopting the parties' stipulation was issued [by the special master] on May 21, 2007."  Id.  On October 10, 2007 petitioner filed a motion with the special master for attorneys' fees, which included "time spent by his current counsel of record, Mr. [Clifford] Shoemaker; time spent by his former counsel of record, Mr. [Joel] Korin; and costs of the case, such as the expense of obtaining reports from the various experts."  Id.  Petitioner requested $173,443.20 ($235,244.07 - $61,800.87) in attorneys' fees, see Petitioner's Motion for Review (petitioner's Motion or Pet'r's Mot.) 1 (stating that petitioner requested a total of $235,244.07 in fees and costs); Sabella, 2008 WL 4426040, at *27 (stating that petitioner requested a total of $61,800.87 in costs), and $61,800.87 in costs, Sabella, 2008 WL 4426040, at *27.  The special master issued a decision awarding petitioner $62,207.50 in attorneys' fees and $17,742.28 in costs on September 23, 2008.  Id. at *45.

Petitioner filed a motion for review on September 29, 2008, which the court found did not comply with Vaccine Rule 24, located in Appendix B to the Rules of the United States Court of Federal Claims (RCFC), because it exceeded 20 pages.  Order of Oct. 1, 2008.  The court regarded the motion for review as filed for timeliness purposes, but ordered petitioner to "file a motion for review that complies with the page limit set forth in [Vaccine Rule] 24."  Id.  On October 6, 2008, petitioner filed a motion requesting leave to exceed the page limit set forth in Vaccine Rule 24, which respondent opposed.  Order of Oct. 14, 2008.  The court granted petitioner's motion to exceed the page limit on October 14, 2008.  Id.  Petitioner filed petitioner's Motion on October 15, 2008.  Respondent filed Respondent's Memorandum in Response to Petitioner's Motion for Review (respondent's Response or Resp't's Resp.) on November 12, 2008.  Petitioner claims that "the Special Master misapplied the law and abused his discretion, and that many of his reductions were arbitrary and capricious."  Pet'r's Mot. 1.  More specifically, petitioner states:

> The Special Master abused his discretion by arbitrarily and capriciously slashing petitioner's attorneys' hours in a punitive manner, by applying, in hindsight, an arbitrary and unsupported "second-guessing" analysis to hours, that he further misapplied the law with respect to a determination of hourly rates, and finally, that his determinations with respect to allowable petitioner's costs is contrary to law, arbitrary and capricious and an abuse of his discretion.

Pet'r's Mot. 1.

2

II.    Standard of Review

The provisions of the National Vaccine Injury Compensation Program (Vaccine Program) are set forth in §§ 300aa-10 through 300aa-34 of title 42 of the United States Code.  42 U.S.C. §§ 300aa-10 to 300aa-34 (2006).  When reviewing a decision of a special master, the United States Court of Federal Claims may:

> (A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
> (B)  set aside any finding of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
> (C)  remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2).  Findings of fact are reviewed under the deferential "arbitrary and capricious" standard, Lampe v. Sec'y of Health & Human Services, 219 F.3d 1357, 1360 (Fed. Cir. 2000), and conclusions of law are reviewed de novo, Saunders v. Sec'y of the Dep't of Health & Human Services, 25 F.3d 1031, 1033 (Fed. Cir. 1994).  Discretionary rulings are reviewed under the "abuse of discretion" standard.  Id.  An example of a discretionary ruling is an evidentiary ruling.  Plavin v. Sec'y of the Dep't of Health & Human Servs. (Plavin), 40 Fed. Cl. 609, 622 (1998).  "Under the abuse of discretion standard, this court can only reverse for an error in interpreting law, or exercise of judgment on clearly erroneous findings of material fact, or irrational judgment in weighing relevant factors."  Id.  The Vaccine Rules of the United States Court of Federal Claims "accord the special master extensive discretion in conducting proceedings."  Id.; see also Hines v. Sec'y of the Dep't of Health & Human Services (Hines), 940 F.2d 1518, 1528 (Fed. Cir. 1991) (noting that the "arbitrary and capricious" standard is highly deferential).  "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate."  Hines, 940 F.2d at 1528.

Under the Vaccine Program, reasonable attorneys' fees and costs may be awarded to petitioner even if petitioner is not the prevailing party.  42 U.S.C. § 300aa-15(e)(1).  The statute states:

> If the judgment of the United States Court of Federal Claims on . . . a petition [filed under 42 U.S.C. § 300aa-11] does not award compensation, the special master or court may award an amount of compensation to cover

petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

42 U.S.C. § 300aa-15(e)(1).  According to the United States Court of Appeals for the Federal Circuit (Federal Circuit), "The determination of the amount of reasonable attorneys' fees is within the special master's discretion."  Saxton v. Sec'y of the Dep't of Health & Human Servs. (Saxton), 3 F.3d 1517, 1520 (Fed. Cir. 1993).  Furthermore, special masters in the vaccine program are "entitled to use their prior experience in reviewing fee applications."  Id. at 1521 (noting that "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests").  "In determining attorneys' fees, the special master is not limited to the objections raised by respondent."  Lamar v. Sec'y of Health & Human Servs., No. 99-583V, 2008 WL 3845165, at *5 (Fed. Cl. July 30, 2008) (citing Moorhead v. United States, 18 Cl. Ct. 849, 854 (1989)).  "However, to permit this court to perform its review function and determine whether any abuse of discretion occurred, the special master must provide an appropriate description of the relevant experience and the reasoning that [he or] she used, based on that experience, to reach [his or] her conclusions."  Wasson v. Sec'y of the Dep't of Heath & Human Servs. (Wasson), 24 Cl. Ct. 482, 486 (1991), aff'd, 988 F.2d 131 (Fed. Cir. 1993) (table).

The Court of Federal Claims uses a two-step process known as the lodestar method for determining the award of reasonable attorneys' fees.  Avera v. Sec'y of the Dep't of Health & Human Servs. (Avera II), 515 F.3d 1343, 1347 (Fed. Cir. 2008), aff'g Avera v. Sec'y of the Dep't of Health & Human Servs. (Avera I), 75 Fed. Cl. 400 (2007); Rupert v. Sec'y of the Dep't of Health & Human Servs. (Rupert), 52 Fed. Cl. 684, 686 (2002); see Hensley v. Eckerhart (Hensley), 461 U.S. 424, 433-34 (1983).  The first step is to determine "the number of hours reasonably expended on the litigation" and multiply it "by a reasonable hourly rate."  Hensley, 461 U.S. at 433; Avera II, 515 F.3d at 1347-48.  This "initial estimate of reasonable attorneys' fees" is called the lodestar.  Rupert, 52 Fed. Cl. at 686.  "The burden is on the fee applicant to establish the lodestar."  Id.  "[A] reasonable hourly rate is 'the prevailing market rate,' defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  Avera II, 515 F.3d at 1348 (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)).  The Federal Circuit has held that "to determine an award of attorneys' fees, a court in general should use the forum rate in the lodestar calculation."  Avera II, 515 F.3d at 1349.  However, the Federal Circuit recognizes a limited exception to the

forum rule "'where the bulk of [an attorney's] work is done outside the jurisdiction[2] of the court and where there is a <u>very significant</u> difference in compensation favoring D.C.'" <u>Id.</u> (quoting <u>Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. EPA</u> (<u>Davis</u>), 169 F.3d 755, 758 (D.C. Cir. 1999)) (emphasis in <u>Davis</u>) (alteration in <u>Avera II</u>) (footnote added).  In such a case, the applicable market rate is the community where the bulk of the work was performed.  <u>See Avera II</u>, 515 F.3d at 1350.  "If such market rate [cannot] be determined, it would not [be] arbitrary or capricious for the special master to . . . create[] a reasonable rate based on the findings of other courts, or, in the absence of objective evidence, on his personal knowledge of petitioner's attorneys' customary billing rates."  <u>Rupert</u>, 52 Fed. Cl. at 692 (citations omitted).  The special master must adequately explain his reasons for developing the stated reasonable rate.  <u>See id.</u> at 694 (remanding case to the special master to make explicit findings regarding prevailing market rates).

"[H]ours that were not 'reasonably expended'" should be excluded from the initial lodestar calculation.  <u>Hensley</u>, 461 U.S. at 434 (quoting S. Rep. No. 94-1011, at 6 (1976), <u>as reprinted in</u> 1976 U.S.C.C.A.N. 5908, 5913[3]).  An effort should be made by petitioner to "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such

---

[2] Although the jurisdiction of the United States Court of Federal Claims is not limited to a particular geographic area within the United States, <u>see</u> 28 U.S.C. § 2505, the term "jurisdiction" in the context of establishing the lodestar, <u>see Avera v. Sec'y of the Dep't of Health & Human Servs.</u> (<u>Avera II</u>), 515 F.3d 1343, 1349 (Fed. Cir. 2008), refers to the immediate geographic neighborhood of the court and not the entire area over which the court has jurisdiction.  The United States Court of Appeals for the Federal Circuit found that using the market rate in the community where the bulk of the work was performed was a "sound approach to setting the reasonable rate of attorneys' fees in Vaccine Act cases in which the bulk of the work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower."  <u>Avera II</u>, 515 F.3d at 1349.

[3] The Civil Rights Attorney's Fees Awards Act of 1976 amended the Civil Rights Act of 1866 to "allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  The Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. No. 94-559, § 2278, 90 Stat. 2641 (1976).  A June 29, 1976 Senate Report (Senate Report) noted that the "appropriate standards . . .  are correctly applied in . . . . cases [that] have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys."  S. Rep. No. 94-1011, at 6 (1976), <u>as reprinted in</u> 1976 U.S.C.C.A.N. 5908, 5913 (citations omitted).  The Senate Report also stated:  "In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, 'for all time reasonably expended on a matter.'"  <u>Id.</u> (citations omitted).

hours from his fee submission." Id. at 434.  Because "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates," Hensley, 461 U.S. at 437, the petitioner "should present adequate proof at the time of submission [of the fee application]," Wasson, 24 Cl. Ct. at 484 n.1.  The court may reduce the award if the petitioner does not provide adequate documentation of hours.  Hensley, 461 U.S. at 433.  "[T]he failure to document the claimed costs results in denial of that claim."  Wilcox v. Sec'y of the Dep't of Health & Human Servs. (Wilcox), No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997) ("It is incumbent upon petitioner to explain to the court why the hours spent on the case were reasonable.").  Because the special master is familiar with the litigation, a special master's decision to reduce the number of hours is entitled to deference.  Saxton, 3 F.3d at 1521 ("It was well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, was reasonable for the work done.").

In the second step of the lodestar analysis, the court may adjust the fee award upward or downward "to keep the fee in line with the nature of the services rendered in the particular case."  Rupert, 52 Fed. Cl. at 686; Avera I, 75 Fed. Cl. at 403; see Hensley 461 U.S. at 434.  "[T]he awarding court must articulate its reasons for the award or denial of fees."  Rupert, 52 Fed. Cl. at 690 (citing Hensley, 461 U.S. at 437 ("It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award.")).  The special master is not "required to base his . . . decisions on a line-by-line evaluation of the fee application."  Carter v. Sec'y of the Dep't of Health & Human Servs. (Carter), No. 04-1500V, 2007 WL 2241877, at *3 (Fed. Cl. Spec. Mstr. July 13, 2007).  The special master can choose to reduce the award by a percentage. Hensley, 461 U.S. at 438 n.13 ("In addition, the District Court properly considered the reasonableness of the hours expended, and reduced the hours of one attorney by thirty percent to account for his inexperience and failure to keep contemporaneous time records."); Mares v. Credit Bureau of Raton (Mares), 801 F.2d 1197, 1203 (10th Cir. 1986) ("A general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use.").  "The burden is not for the court to justify each dollar or hour deducted from the total submitted by counsel.  It remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero."  Mares, 801 F.2d at 1210.

"Fees for experts are subject to the same reasonableness standards as fees for attorneys."  Baker v. Sec'y of the Dep't of Health and Human Sevrs. (Baker), No. 99-653V, 2005 WL 589431, at *1 (Fed. Cl. Spec. Mstr. Feb. 24, 2005).  Courts have considered a number of factors when determining reasonable expert fees, including:

the witness'[s] area of expertise; the education and training required to
provide [the expert] the necessary insight; the prevailing rates for other
comparably respected available experts; the nature, quality, and complexity
of the information provided; the cost of living in the expert's geographic
area; and any other factor likely to assist the [court] in balancing the various
interests in the case.

Id. (citing Wilcox, 1997 WL 101572, at *4. "In addition, courts may also look to (1) the
fee actually charged the party who retained the expert; and (2) fees traditionally charged
by the expert on related matters." Wilcox, 1997 WL 101572, at *4. Petitioner has the
burden of providing the foregoing information concerning expert fees. Id.

III.    Decision of the Special Master and Analysis

The special master identified the disputed topics relating to petitioner's request for
attorneys' fees as "the hourly rate for Mr. Sabella's attorneys, . . . the reasonable number
of hours spent by Mr. Sabella's attorneys, . . . the reasonableness of the costs sought for
Mr. Sabella's experts, and . . . other miscellaneous items of costs." Sabella, 2008 WL
4426040, at * 2. Petitioner argues that "the Special Master misapplied the law and
abused his discretion, and that many of his reductions were arbitrary and capricious."[4]
Pet'r's Mot. 1. Respondent argues that "[t]he special master correctly relied upon his
experience in the Vaccine Program" and "made entirely proper reductions to the fees and
costs requested by petitioner." Resp't's Resp. 1. Respondent contends that the special
master's "analysis is clearly set forth such that there is sufficient information for the
reviewing court to assess whether he abused his discretion." Id. at 9. According to
respondent, the special master's determinations "that petitioner's request for fees and
costs was not reasonable, and that petitioner did not adequately substantiate his
application for fees and costs," and the special master's subsequent adjustments to
petitioner's fee requests, should be affirmed. Id. at 4 ("The special master clearly
articulated the bases for his decision, and provided sound reasoning for his
conclusions.").

_____

[4] Petitioner argues that because Special Master Moran was not assigned to the case until
April 2006 he is somehow not qualified to determine the reasonable amount of fees and costs for
any period prior to April 2006. Petitioner's Motion for Review (petitioner's Motion or Pet'r's
Mot.) 4 n.1, 10. Respondent argues, and the court agrees, that petitioner's argument is without
merit. Respondent's Memorandum in Response to Petitioner's Motion for Review (respondent's
Response or Resp't's Resp.) 14 ("Here, the special master carefully canvassed all the billing
records submitted by petitioner, as he was required to do.").

A.      Attorneys' Fees

Mr. Sabella requested $173,443.20 in attorneys' fees.  See supra Part I (calculation of amount of fees sought).  The special master awarded Mr. Sabella $62,207.50 in attorneys' fees.  Sabella, 2008 WL 4426040, at *26.

1.      Reasonable Hourly Rate

Petitioner requested that Mr. Shoemaker and his associates be awarded the prevailing market rate in Washington, D.C., ranging from $440 to $645 for Mr. Shoemaker and $390 to $536 and $255 to $380 for his associates.  Sabella, 2008 WL 4426040, at *3.  The special master applied the lodestar analysis to determine the reasonable hourly rates for Mr. Sabella's attorneys, awarding hourly rates from $250 to $310 per hour for Mr. Shoemaker, and from $155 to $215 per hour for his associates.  Id. (applying the analytical framework established in Avera II, 515 F.3d at 1348).  The special master noted that these were the amounts originally requested by petitioner prior to the assertion that Mr. Shoemaker and his associates were entitled to the higher prevailing market rate in Washington, D.C.  Id.

Petitioner did not argue, nor did the special master find any evidence, that Mr. Shoemaker and his associates performed any work in the District of Columbia.  Id. at *3-4.  Instead, petitioner argued that because the bulk of the work was performed in the Washington, D.C. metropolitan area – Mr. Shoemaker's office is located in Vienna, VA – the hourly rates in Washington, D.C. should apply.  See id. at *4.  The special master found that "work performed in a suburb of Washington, D.C. is not the same, for an analysis of the forum rate . . . , as work performed within the District of Columbia" and that "Mr. Shoemaker and his associates performed most, if not all, of their work outside of the District of Columbia."  Id.  After calculating that the proposed minimum rate of $440 per hour for Washington, D.C. "is 46 percent higher" than Mr. Shoemaker's typical hourly rate of $300 per hour, the special master determined that there was a "very significant difference" between the two rates.  Id. at *5.  The special master stated that this determination "is informed by the policy behind fee-shifting statutes."  Id.  The policy behind fee shifting statutes is not to provide "'a form of economic relief to improve the financial lot of attorneys,'" it is to "'enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.'"  Id. (quoting Pennsylvania v. Del. Valley Citizen's Council for Clean Air, 478 U.S. 546, 565 (1986)).  The special master held that the exception to the forum rule applies and that Mr. Shoemaker should not be reimbursed at the hourly rate prevailing in Washington, D.C.  Id. at *6.  The special master then stated that "[t]he reasonable rates for Mr. Shoemaker and his associates are the rates set by an agreement between Mr.

Shoemaker and attorneys from the United States Department of Justice." Id.  While noting that petitioner claimed that the agreement's hourly rates "'are the result of a compromise reached after a fairly nasty battle between the firm and Respondent's counsel involving at least three special masters and nine cases. . . . [and that] [a]s a compromise they are by definition not reflective of the lodestar market rate,'" id. (quoting Petitioner's Response to Respondent's Opposition to Petitioner's Application for Attorneys' Fees and Costs and Amended Application for Attorneys' Fees and Costs 5), the special master found that "[t]he market rate can be a product of negotiations between a willing buyer of legal services and a willing seller of legal services," id. (citations omitted).  According to the special master, "If Mr. Shoemaker did not want to agree to the proposed hourly rates, then Mr. Shoemaker could have refrained from the agreement and sought a decision from a special master."  Id.

Prior to Mr. Shoemaker's becoming Mr. Sabella's counsel of record, Mr. Sabella's counsel of record was Mr. Korin of Kenney & Kearney, P.C. (Kenney & Kearney).  Id. at *7.  From the time he commenced work on Mr. Sabella's case in June 2002, until the dissolution of Kenney & Kearney on October 15, 2005, Mr. Korin was assisted by Jane A. Kenney, another attorney at the firm.  Id.  Ms. Kenney ended her representation of Mr. Sabella when Kenney & Kearney closed, but Mr. Korin continued to represent Mr. Sabella at the firm of Ballard Spahr Andrews & Ingersoll, LLP (Ballard Spahr).  Id.  Mr. Korin stated that he charged $200 per hour while at Kenney and Kearney.  Id.  Mr. Korin's hourly rate at Ballard Spahr was $295 per hour in 2005, $320 per hour in 2006, and $345 per hour in 2007.  Id.  Petitioner claimed Mr. Korin was entitled to an increased hourly rate when he changed firms and respondent objected.  Id.   The special master analyzed the dispute as follows:

> The invoices showing that Mr. Korin charged some clients at Ballard Spahr at least $300 do not address the circumstances of Mr. Korin's ongoing relationship with Mr. Sabella.  Three hundred dollars per hour may be a reasonable rate for an attorney with Mr. Korin's experience and skills for matters that began at Ballard Spahr in 2005 or 2006.  But, Mr. Sabella's relationship with Mr. Korin began before that date and Mr. Sabella has not justified using the higher hourly rate.

Id. at *8.  The special master then concluded that Mr. Korin was not entitled to an increased hourly rate when he changed law firms and that Mr. Korin's reasonable hourly rate is $200 per hour.  Id. at *9.

The special master has discretion in determining the reasonable amount of attorneys' fees and costs to award to petitioner.  See 42 U.S.C. § 300aa-15(e)(1); Saxton,

3 F.3d at 1520.  As respondent argues, "the trial forum is in the best position to assess the reasonableness of petitioner's attorneys' fees petition because the trial court has the greatest familiarity with the proceedings in a case."  Resp't's Resp. 7 (citing Duncan v. Sec'y of Health and Human Servs., No. 99-455V, 2008 WL 2465811 (Fed. Cl. Spec. Mstr. May 30, 2008), aff'd, 2008 WL 4743493 (Fed. Cl. Aug. 4, 2008) (finding that the special master is in a better position than the court reviewing the decision of the special master to "critique the hours spent") and Saxton, 3 F.3d at 1521).  Under Avera II "a reasonable hourly rate is 'the prevailing market rate,' defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  Avera II, 515 F.3d at 1348 (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)).  Attorneys' fees are based on the prevailing rate in the forum, in this case Washington, D.C., except "'where the bulk of [an attorney's] work is done outside the jurisdiction of the court and where there is a very significant difference in compensation favoring D.C.'"  Avera II, 515 F.3d at 1349 (quoting Davis, 169 F.3d at 758) (emphasis in Davis) (alteration in Avera II).  As respondent correctly states, Resp't's Resp. 7, the special master's determinations are reviewed under an abuse of discretion standard, Saxton, 3 F.3d at 1520; Plavin, 40 Fed. Cl. at 622, and "the special master is empowered to review the fee petition for reasonableness and can make adjustments he deems necessary as long as he articulates the basis for those adjustments," Resp't's Resp. 7; see Saxton, 3 F.3d at 1521; Rupert, 52 Fed. Cl. at 692-94; Wasson, 24 Cl. Ct. at 486. The special master clearly articulated his reasons for establishing the reasonable hourly rates for Mr. Korin and Mr. Shoemaker.  See Sabella, 2008 WL 4426040, at *3-9.  The court therefore finds unpersuasive petitioner's unsupported accusation that the special master's decision not to afford Mr. Korin payment for an annual rate increase is "ludicrous."  Pet'r's Mot. 26-27.

One of petitioner's initial arguments is that a special master cannot sua sponte reduce fee requests.  Pet'r's Mot. 3 (citing Bell v. United Princeton Props. Inc. (Bell), 884 F.2d 713, 719 (3d Cir. 1989) ("[A] sua sponte reduction of a fee request deprives the fee applicant of her entitlement 'to offer evidence in support of the reasonableness of her request.'" (citation omitted))).  Petitioner takes issue with the fact that the special master initiated the dispute over whether to apply forum rates to Mr. Shoemaker's hourly rate. Pet'r's Mot. 26.  Respondent contends that "respondent filed numerous and substantive objections to petitioner's fee request, and petitioner was given repeated opportunities to offer evidence as to the reasonableness of the fee request."  Resp't's Resp. 7-8. Petitioner's argument was raised and disposed of in Savin v. Sec'y of Health & Human Servs. (Savin), No. 99-537V, 2008 WL 5553274 (Fed. Cl. Oct. 17, 2008), where the court rejected the same argument advanced by petitioner here:

It thus appears that <u>Bell</u> may be read as merely indicating that a court may not <u>sua sponte</u> reduce a fee request if it lacks any factual or experiential foundation upon which to do so.  That, of course, is not the case here.  Any broader reading of the Third Circuit's opinion in <u>Bell</u> – for example, the one petitioners offer – collides with the fact that virtually every other circuit has held that a judge has an independent responsibility to assess the reasonableness of claimed fees and costs, whether [or not] particular items are challenged.  This court has likewise so concluded, doing so, most recently, in rejecting the appeal of the denial of another fee request filed by the same counsel.  On that occasion, this court stated that "the Special Master has an independent responsibility to satisfy himself that the fee award is appropriate and [is] not limited to endorsing or rejecting respondent's critique."

<u>Savin</u>, 2008 WL 5553274, at 7-8 (footnote omitted) (quoting <u>Duncan v. Sec'y of Health & Human Servs.</u> (<u>Duncan</u>), 99-455V, 2008 WL 4743493, at *1 (Fed. Cl. Aug. 4, 2008) and citing <u>Guy v. Sec'y of Health & Human Servs.</u>, 38 Fed. Cl. 403, 406 (1997)).  Respondent correctly argues that "[t]he special master is neither required to give petitioner 'notice' of his concerns nor an opportunity to submit further evidence to substantiate the fee petition."  Resp't's Resp. 12 n.2 (citing <u>Saunders v. Sec'y of Health & Human Servs.</u> (<u>Saunders</u>), 26 Cl. Ct. 1221, 1226 (1992) and <u>Duncan</u>, 2008 WL 4743493, at *1).  In <u>Saunders</u>, the court stated:

> Petitioner's claim was disallowed because the proof was lacking.  The suggestion that the special master had an obligation to cure this defect by calling upon counsel to supply the missing information misconstrues the relationship between court and counsel.  Even under the less adversarial mode of proceeding that characterizes litigation before the special masters, it remains counsel's responsibility to submit proof sufficient to support the point in issue.

<u>Saunders</u>, 26 Cl. Ct. at 1226.  We agree with respondent, as well as the special master, that "the Special Master ha[s] no additional obligation to warn petitioners that he might go beyond the particularized list of respondent's challenges."  <u>Duncan</u>, 2008 WL 4743493, at *1.  As respondent states, a "petitioner must submit with the fee application sufficient documentation that substantiates the fees and costs requested."  Resp't's Resp. 5; <u>see Wasson</u>, 24 Cl. Ct. at 484 n.1.  It is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, [is] reasonable for the work done."  <u>Saxton</u>, 3 F.3d at 1521.  Respondent argues, and the court agrees, that "petitioner never provided the documentation or explanation required to meet his burden

of proof, despite having been put on notice of numerous issues by respondent's
pleadings." Resp't's Resp. 11.

2.      Reasonable Number of Hours

The special master noted that he possessed discretion to reduce the number of
hours awarded because a special master is familiar with the litigation and "'is somewhat
of an expert in the time required to conduct litigation.'" Sabella, 2008 WL 4426040, at
*9 (citations omitted). The special master used the factors set forth by the Court of
Appeals for Veterans Claims to evaluate petitioner's requests for attorneys' fees for more
than one attorney. Id. at *11. The factors are: "'(1) the complexity of the case, (2) the
need for specialized knowledge, (3) whether the case presents an important issue of first
impression, (4) the magnitude of the tasks involved in the litigation, and (5) identification
of the specific and distinct tasks assigned to each lawyer.'" Id. (quoting Baldridge v.
Nicholson, 19 Vet. App. 227, 237-38 (2005)). The special master found that "Mr.
Sabella's case is not especially complicated" when compared to cases outside of the
Vaccine Program, id., and "is more complicated than other cases in the Vaccine
Program," id. While recognizing that Mr. Shoemaker's experience was an asset, the
special master determined it was not required for successful litigation. Id. at *12 ("By
issuing Rules for vaccine cases, the Court of Federal Claims has attempted to establish a
structure that facilitates the participation of new attorneys. . . . Without a more
experienced attorney to guide them, these attorneys who are new to the Vaccine Program
achieve results that are comparable to the results that would have been expected from a
more experienced practitioner."). The special master then determined that Mr. Sabella's
case was not one of first impression and that the magnitude of tasks "were somewhat
larger than typical litigation in the Vaccine Program, although the difference is not very
significant." Id. at *12-13. With respect to the fifth and final factor, the special master
found that "Mr. Sabella did not explain how the duties of Mr. Korin, Ms. Kenney and Mr.
Shoemaker were segregated to prevent overstaffing or to contribute to advancement," and
that "Mr. Shoemaker's activities [were] not different in any meaningful way from the
tasks that Mr. Korin was performing around the same time." Id. at *13. The special
master found that each of Mr. Sabella's attorneys "appear[ed] to be doing a little bit of
everything" and "spent more time on this case than was reasonable." Id. at *14. The
special master therefore reduced the numbers of hours worked by Mr. Sabella's attorneys
because he determined that "so many attorneys caused overstaffing and inefficiency." Id.
at * 2.

According to petitioner, Mr. Sabella's case was "extremely complicated and
involved numerous issues," justifying the use of multiple attorneys and the large number
of hours worked. Pet'r's Mot. 14-15. Petitioner further contends that this "was a case of

first impression."  Pet'r's Mot. 29 (challenging "the special master to find another case with the same facts").  According to respondent, considering the "weak evidence of [chronic fatigue syndrome (CFS)], and petitioner's failure to actively pursue this theory, petitioner's claim that he should be awarded more compensation for attorneys' fees and costs because this case was 'one of the first cases of [CFS] caused by [the] Hepatitis B vaccine (HBV) to move to hearing' is not persuasive."  Resp't's Resp. 14 (quoting Pet'r's Mot. 23) (footnote omitted).  The special master recognized that "Mr. Sabella's case is more complicated than other cases in the Vaccine Program," Sabella, 2008 WL 4426040, at *11, but he also found that the case was needlessly complicated by the introduction of the CFS theory, id. at *12.  The special master also determined that Mr. Sabella's case was not a case of first impression because "[w]ithout the formation of an omnibus proceeding, Mr. Sabella's case would not affect, much less control, the outcome of any other case," and because "special masters had hearings in several other cases involving the hepatitis B vaccine while Mr. Sabella's case was being developed."  Sabella, 2008 WL 4426040, at *12-13.

To simplify the analysis the special master divided the litigation into five parts:  (1) the period from the beginning of work until the filing of the petition, (2) the period from the filing of the petition until Mr. Shoemaker joined the case, (3) the period from when Mr. Shoemaker joined the case until Mr. Shoemaker became counsel of record, (4) the period from when Mr. Shoemaker became counsel of record until the entitlement phase of the case ended, and (5) the period of the fee application.  Id. at *14-25.  The special master awarded Mr. Sabella a total of $62,207.50 in attorneys' fees, an amount "within the top amounts the [special master] has awarded in attorneys' fees to a single petitioner."  Id. at *26-27.

    a.    Attorneys' Fees Awarded for the Period Prior to the Filing of the Petition

Petitioner requested over $27,000, and the special master awarded $10,000, for this period.  Sabella, 2008 WL 4426040, at *14-16.  The special master determined that the 109.3 hours claimed by Mr. Korin and Ms. Kenney and the 75.6 hours claimed by staff members, with a total value exceeding $27,000, was unreasonable.  Id. at *14.  The special master recognized that the lower $200 hourly rate for Mr. Korin and Ms. Kenney justifies some additional time spent on basic legal research for attorneys new to the Vaccine Program, but found that it did not justify all of the hours claimed for the preparation of the petition.  Id. at *15.  Noting that "a reduction in the number of hours is not required to be justified on a line-by-line or hour-by-hour basis," the special master identified certain "places where some inefficiency and/or duplication of efforts increased the number of hours."  Id.

Petitioner emphasizes that "while no one suggested that the time recorded was not spent doing what was described, and while no one is challenging the rates charged for this period of time, the special master has simply concluded that $10,000 will be awarded for this work." Pet'r's Mot. 5. The special master, however, is not required to award fees and costs for every hour claimed, he need only award fees and costs that are reasonable. See 42 U.S.C. § 300aa-15(e). As respondent states, "That petitioner's lawyers actually expended the time does not automatically establish that the time was reasonably expended." Resp't's Resp. 10.

In response to the special master's determination that Mr. Korin and Ms. Kenney duplicated work, petitioner argues that Mr. Korin and Ms. Kenney in fact "divided the work quite well." Pet'r's Mot. 5. According to petitioner, "Having two lawyers work together on a potential malpractice case was the normal, customary procedure for this law firm, and it is the normal, customary procedure for many law firms, whether on the plaintiff or defense side of such a case." Pet'r's Mot. 4. According to respondent, however, "[t]he use of multiple attorneys in vaccine proceedings is actually rare." Resp't's Resp. 11. The special master is entitled to use his prior experience when determining the amount of reasonable attorneys' fees and this determination is entitled to deference. Saxton, 3 F.3d at 1520-21. The special master is required to provide reasons for his conclusions, in order to enable the reviewing court to address whether there has been an abuse of discretion, Wasson, 24 Cl. Ct. at 486, and the special master has adequately provided such reasoning in this case.

According to petitioner, the 45.5 hours that the special master deemed too long to have been spent working on a medical chronology, Sabella, 2008 WL 4426040, at *15, included time spent on "a lot more than just preparing a medical chronology," Pet'r's Mot. 6. Petitioner notes, "No one is suggesting that the paralegal did not spend the time recorded or that the work performed was anything but first rate. The special master just thinks it was too much, without indicating what he considers an appropriate amount should have been." Id. Petitioner also takes issue with the special master's determination that the time Mr. Korin spent developing a report on economic damages with Dr. Wolf was unnecessary. Id. at 7. With respect to the special master's determination that Mr. Korin and Ms. Kenney spent too long drafting documents, petitioner argues that "the special master gives us no idea how many hours he is criticizing or how many hours he is deducting, so the Court has no way of evaluating whether he is being reasonable in reducing hours or is just being arbitrary and capricious." Id. According to petitioner, "This was the first time these lawyers had ever filed a petition in the program, and they were exercising the highest degree of care to make sure that they were doing things correctly." Id. The burden, however, is on petitioner to show that the hours claimed are reasonable, Hensley, 461 U.S. at 437; Rupert, 52 Fed. Cl. at 686; Wilcox, 1997 WL

14

101572, at *4, and that proper documentation of the hours expended and hourly rates has been submitted, <u>Hensley</u>, 461 U.S. at 433, 437.

Petitioner further argues that even if the charges for Ms. Kenney were deducted for her participation in "the initial interview with the client, a meeting with a treating doctor, discussions with Dr. Knast, and a meeting between the two attorneys, . . . the amount of the reduction would only be $2,060," Pet'r's Mot. 6, and points out that the time spent with Dr. Wolf developing a report on economic damages amounted to only 1.6 hours at $200 per hour, or a total of $320, <u>id.</u> at 7. Additionally, petitioner argues that removing the time claimed for a review of the second and third drafts of the petition would only amount to a $1,000 reduction in fees. <u>Id.</u> at 7-8. Petitioner claims that even a reduction in the award by the amounts specifically referenced in the special master's decision would only amount to a $6,765 reduction and that therefore, "[a]t the very least, counsel should be awarded $23,884." <u>Id.</u> at 8. As respondent correctly notes, however, "The individual items discussed by the special master are merely <u>examples</u> of the duplication or inefficiency he found in petitioner's counsel's time records. They are not, and need not be, all-inclusive. The special master clearly cited them as being representative of his concerns." Resp't's Resp. 10; <u>see</u> <u>Sabella</u>, 2008 WL 4426040, at *9; <u>Saxton</u>, 3 F.3d at 1521. "In making reductions, the special master is not necessarily required to base his or her decisions on a line-by-line evaluation of the fee application." <u>Carter</u>, 2007 WL 2241877, at *3; <u>see</u> <u>Saxton</u>, 3 F.3d at 1519, 1521. The court finds the special master's award of $10,000 for this period reasonable.

  b. Attorneys' Fees Awarded for the Period From the Filing of the Petition Until Mr. Shoemaker's Participation

For this six-month period of time, from the filing of the petition on November 18, 2002, until Mr. Shoemaker began participating in the case on April 25, 2003, Mr. Korin and Ms. Kenney "charged 78 hours and staff members charged approximately 28 hours." <u>Sabella</u>, 2008 WL 4426040, at *17. The special master determined that the number of claimed hours was excessive and that the total value of the claimed hours, approximately $17,500, was unreasonable. <u>Id.</u> The special master found that some of the activities included in the petition for fees are not compensable, such as time spent investigating a potential medical malpractice action against the doctor who administered the vaccine to Mr. Sabella and the 21.3 hours claimed by Mr. Korin for a trip to Boston in March 2003 for a seminar on vaccines. <u>Id.</u> Even with the reduction in hours for the non-compensable activities, the special master still found the time requested to be "unreasonably high." <u>Id.</u> at *18. He attributed the excessive amount of hours claimed to the duplication of work by Mr. Korin and Ms. Kenney. <u>Id.</u> The special master did find it reasonable, however, to compensate the attorneys for their work searching for doctors to serve as experts. <u>Id.</u>

(noting that "[a]ttorneys who are new to the Vaccine Program can improve it by retaining doctors who have not testified in this program as an expert previously").  The special master awarded $10,000 in attorneys' fees for this period.  Id. at *18.

With respect to this period, petitioner again argues that "there is no claim that the time recorded was not spent performing the activities described, and there is no dispute about the hourly rates charged."  Pet'r's Mot. 8.  As noted above, the special master is not required to award fees and costs for every hour claimed, he need only award fees and costs that are reasonable.  See 42 U.S.C. § 300aa-15(e); Resp't's Resp. 10 ("That petitioner's lawyers actually expended the time does not automatically establish that the time was reasonably expended.").  Petitioner also accuses the special master of arbitrarily deducting $7,500 just because he found the amount of time excessive.  Pet'r's Mot. 8.  Petitioner seems to imply that because the special master "is one of the newest special masters," has "very little experience in the program," and "has never been involved as a lawyer in a law firm pursuing a claim in the program," the special master is not capable of assessing attorneys' fees based on his experience.  Id. at 9.  The court does not credit this argument.  Special Master Moran is an experienced attorney and was selected by the Court of Federal Claims as qualified to serve as a special master within the Vaccine Program.  42 U.S.C. § 300aa-12(c)(1) (stating that "[t]he judges of the United States Court of Federal Claims shall appoint the special masters").  Finally, petitioner acknowledges that the time spent by Mr. Korin attending a conference in Boston "might warrant a deduction of $4,260," but objects to the $7,500 deduction taken by the special master.  Pet'r's Mot. 9.  The special master stated: "Specifying other specific examples of duplicative work is not necessary because special masters possess the discretion to reduce hours by a percentage."  Sabella, 2008 WL 4426040, at *18; see Hensley, 461 U.S. at 438 n.13; Mares, 801 F.2d at 1203.  The court finds the special master's award of $10,000 for this period reasonable.

      c.      Attorneys' Fees Awarded for the Period From Mr. Shoemaker's Participation Until Mr. Shoemaker Became Counsel of Record

Mr. Sabella requested $50,000 for the period encompassing the time from when Mr. Shoemaker began participating in the case on April 25, 2003 until Mr. Shoemaker became counsel of record on December 16, 2005.  Sabella, 2008 WL 4426040, at *18-19.  The approximate charges were 140 hours at $200 per hour for Mr. Korin and Ms. Kenney, 60 hours at $70 per hour for Mr. Korin's and Ms Kenney's support staff, 50 hours at $250 per hour for Mr. Shoemaker, and 22 hours at $150 per hour for other personnel in Mr. Shoemaker's firm.  Id. at *19.  The special master noted that during this time period Mr. Sabella filed medical records and expert reports and seven status conferences were held.  Id.

16

The special master determined that time spent obtaining reports from certain experts, Dr. Geier and Dr. Pretorius, was unreasonable.  Id.; see infra Part III.B.1, 4. With respect to the remaining activities, the special master determined that "[t]he process of filing medical records from approximately ten medical providers, of producing reports from two experts, and of analyzing reports from two contrary experts reasonably takes much less tha[n] the amount of time charged by Mr. Sabella's attorneys." Sabella,2008 WL 4426040, at *19.  According to the special master, it "appears that Mr. Korin, with the assistance of Ms. Kenney, was representing Mr. Sabella reasonably well" and it is not clear "[h]ow Mr. Shoemaker contributed to the advancement of Mr. Sabella's case." Id. at *20.  Stating that, "as the person requesting fees, Mr. Shoemaker bears the burden of explaining why his participation was necessary," the special master noted that "Mr. Shoemaker chose not to provide any specific examples of how he assisted in a way that Mr. Korin could not." Id.  The special master provided examples of "how multiple attorneys unnecessarily increased the amount of time," id. at *21 (discussing the $1,385 charged for an eighteen-minute status conference attended by all three attorneys), "how the participation of two different law firms caused overstaffing," id. at *21-22 (discussing how Mr. Shoemaker's and Mr. Korin's support staffs duplicated work and how there was a "pattern of multiple reviews by several attorneys"), and how work that could have been completed by support staff was charged at an attorney's billing rate, id. at *22 (discussing how attorneys charged for scheduling appointments and performing administrative tasks). The special master determined that "the attorneys could have acted more efficiently" and reduced the reasonable amount of compensation for this period to $15,000.  Id.

Petitioner claims that the special master arbitrarily reduced Mr. Sabella's request for attorneys' fees for this period. Pet'r's Mot. 9.  Petitioner argues that "there is no argument that the time claimed was not spent as it has been described, and the hourly rates are not in question, except for the fact that the special master ignored the agreed[-]upon increase in Mr. Shoemaker's hourly rates from $250 to $275 an hour beginning January 1, 2005." Id. at 9-10.  As noted above, the special master is not required to award fees and costs for every hour claimed, he need only award fees and costs that are reasonable.  See 42 U.S.C. § 300aa-15(e); Resp't's Resp. 10 ("That petitioner's lawyers actually expended the time does not automatically establish that the time was reasonably expended.").  According to petitioner, Pet'r's Mot. 10, there is a contradiction between the special master's reduction of hours for the first period, Sabella, 2008 WL 4426040, at *15 ("Nevertheless, the relatively lower hourly rate does not entirely justify all the number of hours spent in preparing the petition."), and the special master's view that Mr. Korin was a competent attorney who did not need additional assistance from Mr. Shoemaker, id. at *20-21.  The court does not find a defect or contradiction in the reasoning of the special master.  The special master first determined that the number of hours reasonably expended prior to the filing of the petition did not include the entire

17

amount of time that Mr. Korin and Ms. Kenney spent performing basic legal research about the Vaccine Program.  Id. at *15.  The special master then determined "that Mr. Korin, with the assistance of Ms. Kenney, was representing Mr. Sabella reasonably well." Id. at *20.  A determination that some of the hours claimed by Mr. Korin and Ms. Kenney were unreasonable does not preclude a finding that Mr. Korin and Ms. Kenney could adequately represent Mr. Sabella, nor does it preclude a finding that Mr. Shoemaker's participation did not contribute to the advancement of the case.

Petitioner argues that Mr. Korin was undertaking the actions of a "good attorney" when he reached out to Mr. Shoemaker, a more experienced attorney in the vaccine program.  Pet'r's Mot. 10.  As respondent argues, however, "petitioner does not provide any argument or point to any evidence in the record that shows that Mr. Shoemaker's knowledge of the Vaccine Program enhanced petitioner's representation in this case, or that a duplication of efforts was reasonable."  Resp't's Resp. 15.  The special master found that specialized knowledge was not required to bring cases in the Vaccine Program. Sabella, 2008 WL 4426040, at *12 ("The experience of the Office of Special Masters, including the undersigned, is that attorneys who represent petitioners in the program for the first time are able to do so competently.").  Petitioner implies that the special master was somehow using a contingent fee analysis in his determination of attorneys' fees because the special master posited that if Mr. Shoemaker had not assisted Mr. Korin, Mr. Sabella's case would not have come out differently.  See Pet'r's Mot. 10 ("This is not a situation where contingent fees are being awarded.  Fees are awarded in cases where the petitioner does not prevail at all.  Nevertheless, the special master speculates, 'If Mr. Shoemaker did not assist Mr. Korin during this time, would Mr. Sabella's case turned [sic] out differently?  The answer is probably not.'" (quoting Sabella, 2008 WL 4426040, at *20)).  Petitioner argues that "[t]his has never been and cannot be the test for whether or not to award fees to an attorney involved in a vaccine claim."  Id. at 10-11.  The court finds that petitioner misconstrued the special master's analysis.  The court does not understand the special master to say that the award of fees to Mr. Sabella would be different if he had obtained a more favorable overall result; the special master, in the court's view, is merely emphasizing that he did not find Mr. Shoemaker's involvement to be necessary.

The special master referenced the time charged for attending a status conference in May 7, 2003 as an example of how having multiple attorneys led to duplication of work and an inefficient use of time.  Sabella, 2008 WL 4426040, at *21.  According to petitioner, however, "[i]t was actually more economical for all counsel to attend the status conference, rather than to have one attorney be on the call and take notes and then convey the information to the other."  Pet'r's Mot. 11.  Petitioner points out that the entries for work performed by Mr. Shoemaker's support staff, that the special master determined to

be duplicated work performed by staff at Mr. Korin's firm, amounts to only $126.50. Id. at 12. However, the special master is not required to make a line-by-line determination of fees. Carter, 2007 WL 2241877, at *3; see Saxton, 3 F.3d at 1519, 1521. Petitioner's further arguments that the reductions resulting from the denial of entries cited by the special master are "minimal and nowhere close to the $35,000 reduction that the special master made for this time period," Pet'r's Mot. 13, are therefore without merit.

The special master found that "the participation of two different law firms caused overstaffing." Sabella, 2008 WL 4426040, at *21. As an example, the special master discusses the duplication of efforts and inefficiencies that occurred when scheduling Mr. Sabella's visit to Dr. Pretorius. Id. Petitioner argues that "the amounts of money involved were minimal" and that "the special master cannot possibly understand the effort that was involved in setting up this testing." Pet'r's Mot. 12. As examples of how costs were increased by the duplication of efforts of the three attorneys involved, the special master discusses how all three attorneys participated in a conference call with Dr. Geier on October 8, 2003, how all three participated in discussions on neuropsychological testing, and how all three reviewed Dr. Herskowitz's report and Dr. Poser's report. Sabella, 2008 WL 4426040, at *21-22 (questioning "why all attorneys were required to talk with Dr. Geier"). In its Motion, petitioner states: "Apparently, the burden that the special master intends to impose upon counsel from now on is to not only describe the work performed (which has been done in great detail), but also to explain why the work was important and how it advanced the case." Pet'r's Mot. 12; see also id. at 26 (arguing that a "new standard is being imposed upon fee applicants"). Petitioner fails to recognize that the standard he complains of is not a new standard; it is the standard currently imposed on fee applicants. See Hensley, 461 U.S. at 434; Rupert, 52 Fed. Cl. at 686; 42 U.S.C. § 300aa-15(e)(1). The burden is on petitioner to explain why the attorneys' fees claimed are reasonable. See Hensley, 461 U.S. at 437; Rupert, 52 Fed. Cl. at 686; Wilcox, 1997 WL 101572, at *4.

With regard to whether more than one attorney should have participated in discussions with experts or reviewed the expert reports, petitioner argues, "This is simply not the way cases are handled in the real world of civil litigation, and it was not appropriate in this case." Pet'r's Mot. 13. The court finds that, given the special master's discretion in determining the reasonable amount of attorneys' fees, Saxton, 3 F.3d at 1520, and his entitlement to use his "prior experience in reviewing fee applications," id. at 1521, the special master did not abuse his discretion.

Petitioner next contends that "[t]he special master improperly denied fees for the time spent obtaining reports from Dr. Geier and Dr. Pretorius." Pet'r's Mot. 11. The special master reasoned:

19

> In early 2004, if attorneys (1) explained to a reasonable client that the opposing side has retained Dr. Herskowitz, a neurologist and psychiatrist, and (2) proposed retaining Dr. Geier, a geneticist whose opinions about neurological diseases have been criticized, then a reasonable person would not want to pay for Dr. Geier's work.

Sabella, 2008 WL 4426040, at *31.  The court finds this analysis to be reasonable. Similarly, the special master was reasonable in concluding that paying for the work of Dr. Pretorius was unreasonable in the circumstances of this case.  See infra Part III.B.4.  In this connection, the special master noted that Mr. Sabella failed to show how a single-proton emission computed tomography (SPECT) scan advanced his case, that Dr. Rubin and Dr. Poser "could not draw any meaningful conclusions from Dr. [Pretorius]'s report," and that the scan was performed three and a half years after Mr. Sabella received his last dose of the vaccine.  Sabella, 2008 WL 4426040, at *35.  The court cannot say the special master's conclusion was arbitrary, capricious, or an abuse of discretion.

> d.   Attorneys' Fees Awarded for the Period From When Mr. Shoemaker Became Counsel of Record Until the Entitlement Phase of the Case Ended

Mr. Sabella requested $50,000 for the period from when Mr. Shoemaker became counsel of record on December 16, 2005 until Mr. Sabella accepted the judgment of the court on July 12, 2007.  Id. at *22-23.  The approximate charges were 50 hours, id. at *23, at somewhere between $200 per hour and $320 per hour, id., at * 7, for Mr. Korin, 55 hours at $70 per hour for Mr. Korin's support staff, 100 hours at $300 per hour for Mr. Shoemaker, and 20 hours for other personnel in Mr. Shoemaker's firm.  Id. at *23.  The special master found that Mr. Sabella did not offer any explanation for why Mr. Korin continued to participate after Mr. Shoemaker became the counsel of record.  Id. at *24. The special master found the need for two attorneys at the two-day hearing held during this period to be questionable considering that "five of the six witnesses were friendly," and determined that "[a]n attorney with more than 10 years of experience in litigating medicine-based cases can reasonably conduct the examination of five friendly witnesses and one neutral witness over a two-day period."  Id. (noting that in other cases the special master observed Mr. Shoemaker examine three witnesses "competently and without needing the assistance of a second attorney").  The special master also noted that respondent only used one attorney for the two-day hearing and respondent's counsel "was prepared for all witnesses and asked appropriate questions."  Id.  The special master determined reasonable attorneys' fees for this period in the amount of $23,000.  Id. at *25.

Petitioner argues that because Mr. Shoemaker billed 100 hours at $300 per hour, totaling $30,000, the arguments of duplication of efforts alone cannot justify the reduction in fees for this period by $27,000.  Pet'r's Mot. 14.  The special master found that Mr. Sabella did not offer "any explanation as to the division of responsibility between law firms" and that Mr. Shoemaker could have performed many of the activities during this period without the assistance of Mr. Korin.  Sabella, 2008 WL 4426040, at *24. Because the special master found that not all of the time worked during this period was reasonable, the special master made adjustments in order to determine a reasonable amount of attorneys' fees.  Id. at *25.  According to petitioner, however, "Mr. Korin was conscientious about representing his client and chose to associate with a lawyer who has over 30 years of litigation experience involving vaccines and who has been involved in litigating cases in the vaccine program since its inception."  Pet'r's Mot. 14 (noting that "[t]he case was extremely complicated and involved numerous issues").  Petitioner argues that there was a clear division of labor:  "Mr. Korin was primarily responsible for preparing the lay witnesses and the treating doctors, and Mr. Shoemaker was primarily responsible for retaining the other experts, getting their reports and preparing them to testify in a causation hearing."  Id. at 15.  Petitioner justifies what the special master considered duplication by arguing that "it was important for both counsel to be aware of what all the witnesses were saying."  Id.

Regardless of whether Mr. Korin's choice to associate with Mr. Shoemaker was responsible, it was not arbitrary and capricious for the special master to find that, once Mr. Shoemaker became counsel of record, the assistance of Mr. Korin was not always reasonable.  Furthermore, the duplication of efforts by Mr. Shoemaker and Mr. Korin was only one of the factors that the special master used to determine the reasonable number of hours for this period.  See Sabella, 2008 WL 4426040, at *24.  The special master found that "tasks such as filing reports from experts with associated literature and preparing material for trial may be done efficiently by paralegals or other support staff."  Id. at *25. Contrary to what petitioner implies, Pet'r's Mot. 15 ("The special master makes a great deal of the fact that the case was settled before the hearing with numerous experts went forward to a hearing.  That does not negate the fact that counsel had to be prepared to present those experts and cross examine the respondent experts if the case had not settled."), the special master did not state that he was reducing the award for this period because the case settled and he felt that the experts did not need to be retained in the first place, see Sabella, 2008 WL 4426040, at *24-25.  Finally, petitioner's repeated argument that having two attorneys on the case was reasonable and common does not persuade the court that all of the time claimed by Mr. Sabella is reasonable and that the determinations of the special master were arbitrary and capricious.

e.    Attorneys' Fees Awarded for Work Performed With Regard to the Fee
       Application

Mr. Sabella requested attorneys' fees for the time spent litigating the amount of
attorneys' fees. Id. at *25. Mr. Sabella requested $1,000 for the initial application for
attorneys' fees, id., $3,422.50 for briefs filed on December 18, 2007 and February 15,
2008, id. at 26, and additional compensation for work on two briefs discussing Avera II
that were requested by the special master, id. at *25-26. The special master did not award
additional compensation for work on the additional briefs on Avera II because Mr.
Shoemaker did not request additional time for this in his amended application. Id. at *26.
The special master deducted $215 from the time spent on Mr. Sabella's reply brief to
discount for personal attacks against respondent's counsel contained in the reply brief.
Id. The special master determined that reasonable attorneys' fees for this period is
$4,207.50. Id. (noting that $4,207.50 = $1,000.00 + ($3,422.50-$215.00)).

For the fifth and final period of the litigation, petitioner requests "an additional
amount [of] 22 hours at $230/hour for a total of $5,060 for work on the two briefs
discussing Avera [II], and counsel also seeks an additional 25.4 hours at $324.26/hour for
a total of $8,236.20 for work spent on preparing this Motion for Review." Pet'r's Mot.
15. The special master denied compensation for time spent on the two briefs discussing
Avera II because Mr. Shoemaker did not amend his application to request additional time
for this work. Sabella, 2008 WL 4426040, at *26. Respondent argues that "[p]etitioner is
precluded from seeking compensation for these items on appeal, as he failed to properly
request compensation for them before the special master." Resp't's Resp. 15-16 (citing
RCFC, App. B, Vaccine Rule 8(f)). The court finds no abuse of discretion in the decision
of the special master not to award compensation that was not requested. Furthermore,
pursuant to Rule 8(f) of the Vaccine Rules, "Any factor or argument not raised
specifically in the record before the special master shall be considered waived and cannot
be raised by either party in proceedings on review of a special master's decision." RCFC,
App. B, Vaccine Rule 8(f).

With respect to petitioner's request for attorneys' fees for time spent preparing
petitioner's Motion for Review, "[r]espondent believes that some award of compensation
is appropriate for the filing of the [Motion for Review]; however, the amount charged by
petitioner appears high, especially considering that a significant portion of petitioner's
[Motion for Review] is devoted to personally attacking the special master." Resp't's
Resp. 16. Petitioner offers no basis for charging a rate of $324.26 per hour, and, given
the quality of petitioner's Motion and the lack of citations to cases, the court is hesitant to
award compensation for the full 25.4 hours requested. The special master determined that
a reasonable hourly rate for Mr. Shoemaker ranges between $250 to $310 per hour,

<u>Sabella</u>, 2008 WL 4426040, at *3, and the court will therefore apply a rate of $310 per hour to time spent preparing this Motion for Review.

The court is frankly puzzled by the difference between the amount of attorneys' fees requested for work to prepare this Motion for Review and the smaller amount requested for work to prepare the initial fee application.  <u>See</u> Pet'r's Mot. 15; <u>Sabella</u>, 2008 WL 4426040, at *25.  The court notes that Mr. Sabella requested approximately $1,000 for the preparation of the initial application for attorneys' fees before the special master, the filing in which counsel must explain with particularity the bases for his request.  <u>Sabella</u>, 2008 WL 4426040, at *25.  Assuming that counsel, in compliance with the law, sought a "reasonable amount" for preparing the initial fee application, the court cannot understand how counsel could have reasonably expended more than eight times the compensable effort on a motion for review.  The court finds the claim for $8,236.20 unreasonable.  In light of the foregoing, the court finds that, subject to the deduction described in the next paragraph, $2,000.00, an amount that is twice the amount claimed for preparing the initial application, is a reasonable amount to award for work performed on this Motion for Review.

The court does not look favorably on ad hominem attacks.  <u>See</u> <u>In re Cygnus Telecomms. Tech., LLC, Patent Litig.</u>, 536 F.3d 1343, 1360 (Fed. Cir. 2008) ("This court does not condone ad hominem attacks.") (emphasis omitted).  Critical commentary on the special master's tenure as a special master does not aid petitioner's argument.  <u>See</u> Pet'r's Mot. 25-27.  The decision of the special master was not a personal attack on Mr. Shoemaker, as petitioner charges.  <u>See</u> Pet'r's Mot. 25.  The court finds the special master's deduction of $215, representing one hour spent on "attacks against respondent's counsel, personally," <u>Sabella</u>, 2008 WL 4426040, at *26, to be fair and reasonable, and not an abuse of discretion.  Similarly, the court will reduce the amount of attorneys' fees requested for time spent personally attacking the special master in petitioner's Motion for Review.  <u>See</u>, <u>e.g.</u>, Pet'r's Mot. 25, 28.  The court reduces its award of attorneys' fees for the preparation of this Motion for Review by $310, representing one hour spent on ad hominem attacks against the special master.  The court therefore awards petitioner $1,690.00 for work preparing this Motion for Review.

B.    Expert Costs

Mr. Sabella requested approximately $33,394 in costs for experts.  <u>Sabella</u>, 2008 WL 4426040, at *39.  According to the decision of the special master, "The total amount requested in costs is approximately three times greater than any previous award of costs made by the undersigned.  In briefing, Mr. Sabella has not identified any case in which another special master has awarded a comparable amount of costs to a single petitioner."

23

Id. at *27.  The special master limited his analysis to the objections raised by respondent, id., and awarded a total of $7,245[5] in costs for experts, id. at *40.  Petitioner, respondent, and the court are all in agreement that the special master made a mathematical error when adding the total amount of costs awarded for experts.  Pet'r's Mot. 16; Resp't's Resp. 18 (recognizing the mathematical error and stating that "respondent will not object to a correction of this error"); see Sabella, 2008 WL 4426040, at *39.  The actual total costs awarded for experts should have been $13,515, see supra note 5, and the actual total costs awarded should have been $24,012.28, see infra note 8.  The court GRANTS petitioner's Motion insofar as it seeks to correct this mathematical error.[6]  The court will now examine the special master's award of expert costs and each of petitioner's objections to the special master's award of expert costs.

1.     Dr. Mark Geier

Mr. Sabella requested $5,375 for Dr. Geier's work.  Sabella, 2008 WL 4426040, at *29.  One part of this request was a $750 charge to Mr. Korin for a "medical consultation."  Id.  Dr. Grier also submitted an invoice to Mr. Shoemaker for $4,625.  Id.  The special master denied the $750 because Mr. Korin's register contained no explanation of what tasks were performed and there was no way to tell, in light of Dr. Geier's invoice, if any portion of this charge was repetitious.  Id.  The special master also denied 2.5 hours for "original publications" because Dr. Geier offered no explanation as to why he should be compensated for such work and because Mr. Sabella did not deny respondent's assertion that "Dr. Geier has repeatedly attempted to obtain compensation for his original work through the vaccine program."  Id. at *30 ("Mr. Sabella did not offer any justification for why Dr. Geier should be compensated for 'original publications,' which do not appear connected to Mr. Sabella's case.").  After finding that Mr. Sabella failed to explain why Dr. Geier's work "was necessary to advance his case," the special master determined that a "hypothetical, reasonable and paying client," would not have paid for Dr. Geier's work at the time Dr. Geier was retained.  Id. at *30-31.  The special master also determined that because Dr. Geier is a geneticist, his opinion would be of little value regarding the injuries to Mr. Sabella's brain, and that a reasonable person

---

[5] The total of $7,245 in costs for experts awarded by the special master is the result of a mathematical error ($1,000.00 + $1,520.00 + $3750.00 + $0.00 + $0.00 + $1,920.00 + $4,125.00 + $1.200.00 + $0.00 does not equal $7,245.00).  See Sabella v. Sec'y of Health & Human Servs. (Sabella), No. 02-1627V, 2008 WL 4426040, at *39 (Fed. Cl. Spec. Mstr. Sept. 23, 2008).  The correct amount, based on the special master's analysis, is $13,515.00.  See id.

[6] The court notes that this error and objection could and should have been raised by petitioner in a motion for reconsideration before the special master.

would seek a neurologist as the relevant medical specialist. Id. at *30. The special master therefore denied the 7.5 hours, id., claimed for Dr. Geier's writing his report, id. at *31.

The special master found Dr. Geier's request of 4.0 hours for a "literature search" to be reasonable. Id. Dr. Geier also claimed 4.25 hours for reviewing and summarizing Mr. Sabella's medical records, id. at *30, of which the special master determined 1.0 hour to be reasonable, id. at *32. Noting that Mr. Sabella did not provide information concerning Dr. Geier's reasonable hourly rate, the special master determined a reasonable rate of $200 per hour after examining previous decisions of other special masters from 2006, 2007, and 2008 that had determined Dr. Geier's hourly rate. Id. at *32. The special master awarded a total of $1,000 in reasonable costs. Id. at *32 ("This amount is for five hours of work (one hour to learn about Mr. Sabella's case and four hours to search for literature).").

Petitioner claims that the special master "arbitrarily slashed [Dr. Geier's] bill to $1000" and "arbitrarily cut his rate of compensation from $250 an hour . . . to $200 an hour." Pet'r's Mot. 17. In making his determination that $200 per hour is a reasonable rate for Dr. Geier, the special master noted that "Mr. Sabella has provided no information about the reasonable hourly rate for Dr. Geier," and examined decisions of other special masters determining Dr. Geier's reasonable hourly rate. Sabella, 2008 WL 4426040, at *32. While at some point using hourly rates for earlier years could become unreasonable, here the court finds the special master's reliance on rates determined in recent years reasonable and not an abuse of discretion.

Petitioner next takes issue with views expressed in the special master's opinion that petitioner considers attacks on Dr. Geier because he is a geneticist. Pet'r's Mot. 16. Petitioner points out that Dr. Geier is also an epidemiologist, "has performed extensive analyses of the Vaccine Adverse Event Reporting System (VAERS) and the Vaccine Safety Datalink (VSD)," and "has published dozens of papers in the peer[-]reviewed medical literature about adverse reactions to vaccines." Id. at 16-17 (noting that many of Dr. Geier's "articles deal with hepatitis B vaccines in particular"). Petitioner states: "Arguably, the bill from Dr. Geier should be reduced by $625 for what was described as "Original publications" in his invoice, but the balance of his invoice number 763 ($4,000) should be paid." Id. at 17. Respondent, however, argues that "Dr. Geier has been roundly criticized by special masters in vaccine cases as being unqualified to testify about many vaccine injuries, including those involving the brain, such as the case at bar," Resp't's Resp. 19 (citing Daly v. Sec'y of Health & Human Servs., No. 90-590V, 1991 WL 154573, at *6 (Cl. Ct. Spec. Mstr. July 26, 1991)), and that "special masters have tended to be highly critical of Dr. Geier's testimony," Resp't's Resp. 19 (citing Doe v.

25

Sec'y of Health & Human Servs., No. 99-670V, 2004 WL 3321302, at *22 (Fed. Cl. Spec. Mstr. Oct. 5, 2004)).  As respondent argues, "petitioner never provided any evidence or argument as to why Dr. Geier's work was 'necessary to advance' petitioner's case, despite the fact that respondent raised objections concerning 'the usefulness of Dr. Geier's work.'"  Resp't's Resp. 19-20 (quoting Sabella, 2008 WL 4426040, at *30).  The special master's decision was not an abuse of discretion.

2.      Dr. Charles Poser

Mr. Sabella requested $2,600 for time spent by Dr. Poser writing two reports. Sabella, 2008 WL 4426040, at *32.  Dr. Poser claims approximately 7.6 hours at $350 per hour for his work.  Id. at *32-33.  The special master determined that "Mr. Sabella acted reasonably in retaining Dr. Poser," and respondent did not object to the number of hours claimed.  Id. at *33.  Respondent did, however, object to Dr. Poser's proposed hourly rate of $350 per hour.  Id.  The special master determined that a reasonable rate for Dr. Poser would be $200 per hour, the rate awarded to Dr. Poser in Jeffries v. Sec'y of Health & Human Servs., No. 99-670V, 2006 WL 3903710 (Fed. Cl. Spec. Mstr. Dec. 15, 2006). Sabella, 2008 WL 4426040, at *33.  The special master awarded a total of $1,520 in reasonable costs.  Id.

Petitioner contends that "Dr. Poser's bill was . . . extremely reasonable" and that the special master arbitrarily "cut his rate to $200 an hour, citing what he was paid in a case filed in 1999."  Pet'r's Mot. 17.  Petitioner argues that Dr. Poser is highly qualified and offers examples of Dr. Poser's many accomplishments.  Id. at 17-18.  According to petitioner, "For the special master to cut $1080 off of such a reasonable bill is evidence that this entire fee decision was designed to punish Petitioners, their counsel and their experts."  Id. at 18.  Respondent again argues that "petitioner provided little justification to support" the $350 hourly rate requested.  Resp't's Resp. 20.  According to the special master, petitioner's support consisted of a citation to another case, Kemper v. Sec'y of Health & Human Servs. (Kemper), No. 02-1489V (Fed. Cl. Spec. Mstr. Jan. 25, 2007), in which Dr. Poser was awarded a fee of $350 per hour, Sabella, 2008 WL 4426040, at *33. The special master found the citation to Kemper unhelpful because it "did not discuss Dr. Poser's hourly rate at all" and therefore "d[id] not stand as precedent for awarding Dr. Poser $350 per hour."  Id.  According to respondent, "The special master's decision to reduce this hourly rate is based on petitioner's failure to produce evidence justifying it, and is also based on a rate previously awarded to Dr. Poser."  Resp't's Resp. 20.  While at some point using previously awarded hourly rates could become unreasonable, and the issue here is not without some doubt, the court declines to find an abuse of discretion in the special master's decision in this case.

3.     Dr. Yehuda Shoenfeld

Mr. Sabella requested $7,750 for 15.5 hours of work performed by Dr. Shoenfeld at $500 per hour.  Sabella, 2008 WL 4426040, at *33.  The special master found that "Mr. Sabella's retention of Dr. Shoenfeld was reasonable" and that "Dr. Shoenfeld's opinion was useful and relevant in that he explained how a person responds to an immunization." Id. at *34.  The special master faulted Mr. Sabella, however, for failing to provide information regarding Dr. Shoenfeld's hourly rate and for instead providing information about another doctor, Dr. Kinsbourne.  Id.  The special master found Dr. Kinsbourne to be an inadequate comparison to Dr. Shoenfeld because he specializes in a different area of medicine and because Dr. Shoenfeld lives in Tel Aviv, Israel.  Id.  In an effort to determine a reasonable hourly rate, the special master made a comparison between Dr. Shoenfeld and Dr. Joseph Bellanti, another doctor in Dr. Shoenfeld's field who practices in Washington, D.C. and charges $350 per hour.  Id.  The special master deducted $50 from Dr. Bellanti's rate "[t]o account for a possible difference in cost of living and cost of practicing medicine in Washington, D.C. and Tel Aviv, Israel."  Id.  The special master acknowledged having no evidence of the difference in costs between Washington, D.C. and Tel Aviv, Israel, but stated that he wanted to avoid giving Mr. Sabella a windfall in light of the fact that Mr. Sabella had not provided any specific information regarding Dr. Shoenfeld's rate.  Id. ("To the extent that a deduction penalizes Mr. Sabella, the penalty is appropriate because Mr. Sabella has failed to introduce any evidence specifically about Dr. Shoenfeld.  In short, $300 per hour is better than zero dollars per hour.").  The special master then deducted, as unreasonable, three hours that Dr. Shoenfeld claimed for traveling in July 2006 to meet with an attorney.  Id. at *35.  The special master awarded 12.5 hours at $300 per hour, a total of $3,750, in reasonable costs.  Id.

Petitioner argues that the special master's analysis of expert costs was inconsistent. Pet'r's Mot. 18.  Dr. Shoenfeld submitted a bill charging $500 per hour and the special master reduced the hourly rate to $300 per hour.  Sabella, 2008 WL 4426040, at *33-34. The special master noted that, instead of submitting "information about Dr. Shoenfeld's hourly rate, Mr. Sabella provided information about another doctor, Dr. Kinsbourne."  Id. The special master determined that Dr. Kinsbourne's rate of $500 per hour was an inadequate comparison for Dr. Shoenfeld because Dr. Shoenfeld specializes in immunology, a different field of medicine, and lives in a foreign country.  Id.  The special master instead made a comparison to a doctor in the field of Dr. Shoenfeld's specialization, Dr. Bellanti.  Id.  Petitioner argues that because the special master cut Dr. Poser's rate from $350 to $300[7], and Dr. Poser is a neurologist who does not live in a

---

[7] The special master in fact cut Dr. Poser's rate from $350 to $200 per hour.  Sabella,
(continued...)

foreign country, the special master's reasoning is somehow inconsistent.  Pet'r's Mot. 18. The court finds that the special master reasonably looked to the hourly rate of another doctor in Dr. Shoenfeld's field of immunology to aid in his determination of a reasonable hourly rate for Dr. Shoenfeld.  Sabella, 2008 WL 4426040, at *34.

Petitioner complains that the special master further reduced the rate by another $50 to account for differences between costs in Washington, D.C. and Tel Aviv, Israel "without any warning that he was even thinking about such a thing."  Pet'r's Mot. 18. However, the special master has no duty to "warn" petitioner about his reasons for reducing petitioner's claims for costs.  Duncan, 2008 WL 4743493, at *1 (stating that "the Special Master had no additional obligation to warn petitioners that he might go beyond the particularized list of respondent's challenges");  Saunders, 26 Cl. Ct. at 1226 ("The suggestion that the special master had an obligation to cure this defect by calling upon counsel to supply the missing information misconstrues the relationship between court and counsel.  Even under the less adversarial mode of proceeding that characterizes litigation before the special masters, it remains counsel's responsibility to submit proof sufficient to support the point in issue.").  Petitioner also states that if the special master "had done any research, he would have found out that the dollar has dropped considerably in value in relation to Israeli currency, and therefore, if anything, the rate should be increased."  Pet'r's Mot. 18-19.  Respondent counters, correctly, that "the special master is not burdened with proving the reasonableness of Dr. Shoenfeld's hourly rate – petitioner is, and he simply failed to do so."  Resp't's Resp. 20.

The court does not find that the special master was arbitrary or capricious in determining that the total number of hours claimed by Dr. Shoenfeld should be reduced by three hours for time spent by Dr. Shoenfeld traveling to meet with an attorney.  See Sabella, 2008 WL 4426040, at *35.  However, the court views the $50 per hour deduction for possible differences in the cost of living, made in the acknowledged absence of evidence on the point, to be arbitrary and capricious.  The court therefore awards an additional $50 per hour for Dr. Shoenfeld's work.  The reasonable amount of compensation for Dr. Shoenfeld is therefore $4,375 (12.5 hours at $350 per hour).

4.      Dr. Harold Pretorius

Mr. Sabella requested $1,200 for work performed by Dr. Pretorius.  Id.  Dr. Pretorius performed a SPECT scan of Mr. Sabella's brain on August 5, 2003.  Id. According to the special master:

---

[7](...continued)
2008 WL 4426040, at *33, see supra Part III.B.2.

> If the SPECT scan were justified as part of the treatment for Mr. Sabella's
> condition, then Mr. Sabella should have submitted the invoice to his
> insurance company and requested reimbursement.  See 42 U.S.C. § 300aa-
> 15(g).  If the SPECT scan was part of the litigation, Mr. Sabella has not
> shown how it advanced his case.

Id.  Furthermore, the special master found that two doctors with specialized training in
neurology, Dr. Poser and Dr. Rubin, "could not draw any meaningful conclusions from
Dr. [Pretorius]'s report."  Id.  Finally, the special master noted that the SPECT scan was
performed three and a half years after Mr. Sabella received the last dose of the hepatitis B
vaccine, that Mr. Sabella failed to submit an invoice regarding the number of hours Dr.
Pretorius spent on the case, and that Mr. Sabella submitted no basis for determining Dr.
Pretorius's hourly rate.  Id. at *35, 36 n.11.  Because "Mr. Sabella has not established, by
a preponderance of the evidence, that the work of Dr. Pretorius was reasonable," the
special master awarded no compensation.  Id. at *36.

Petitioner argues that "[t]he [SPECT] scan performed by Dr. Pretorius was not
justified as part of any treatment, but was rather undertaken to demonstrate objective
evidence of brain injury."  Pet'r's Mot. 19.  According to petitioner, "[b]y demonstrating
'immune cerebritis[,'] Dr. Pretorius was prepared to testify that this was objective
evidence of the injury experienced by the Petitioner as a result of the vaccines he
received.  Id.  With respect to the special master's concerns with the timing of the SPECT
scan, Sabella, 2008 WL 4426040, at *35 (finding that "[t]he elapse of time makes
attributing any problems detected on the SPECT scan to the vaccine difficult"), petitioner
argues that "there was no evidence of any other brain injury or insult in this case in the
intervening years," Pet'r's Mot. 19.  In the absence of evidence to support his request for
costs with respect to Dr. Pretorius, petitioner makes a personal charge against the special
master, contending that "the special master was preparing to attack Dr. Pretorius'
testimony even before he heard it."  Id.  Further, petitioner suggests that "fees and costs
can even be awarded in situations where someone is engaged as an expert to look at a
case, and they conclude that there is no causation."  Id. at 20.  Given the number of
reasons articulated by the special master for his denial of compensation for the work
performed by Dr. Pretorius, Sabella, 2008 WL 4426040, at *35-36, and the fact that Mr.
Sabella failed to submit an invoice regarding the number of hours Dr. Pretorius spent on
the case or any basis for determining Dr. Pretorius's hourly rate, id. at *35, 36 n.11, the
court finds no abuse of discretion in the special master's determinations regarding Dr.
Pretorius.

5.     Robert P. Wolf, Ed. D. M.B.A.

Mr. Sabella requested $1,250 for Dr. Wolf's preparation of an economic analysis to determine the value of Mr. Sabella's lost earning capacity. Id. at * 36. Because 42 U.S.C. § 300aa-15(a)(3)(B) establishes the rate of compensation for lost earning capacity, the special master found Dr. Wolf's economic analysis unnecessary and awarded no compensation. Id.

Petitioner argues that the special master should not have refused to award any compensation for Dr. Wolf because Dr. Wolf's report "was useful in discussions with the clients about whether to settle the claim and for what amount." Pet'r's Mot. 20. According to petitioner, it was necessary during settlement discussions to talk "about the potential for a civil suit (in the event the vaccine court claim [was] unsuccessful) and what damages would be awarded if such a case were successful." Id. Petitioner also claims that statements by the special master that Mr. Korin spent an unreasonable amount of time researching the vaccine program, Sabella, 2008 WL 4426040, at *15, and that counsel should have been aware of the statute providing for compensation for loss of earning capacity due to injury caused by a vaccine, id. at *36, are incongruous:

> It is ironic that the special master is loathe to award any time for Mr. Korin to research the vaccine program and says that someone like Mr. Shoemaker, with extensive experience in the program is not necessary, but here we have an example of counsel doing the normal, reasonable and prudent thing for his client and being penalized for it.

Pet'r's Mot. 20. The court agrees with the special master that time spent preparing Dr. Wolf's report should not be compensated. The special master awarded fees for some of the time spent on basic legal research for the Vaccine Program. Sabella, 2008 WL 4426040, at *15. It is not unreasonable to find that petitioner's attorneys should have been aware of the basic statutes concerning the Vaccine Program. The special master did not abuse his discretion in awarding no compensation for work performed by Dr. Wolf.

6.    Jerome Knast, Ph. D.

Mr. Sabella requested approximately $5,000 for work performed by Dr. Knast. Id. at *36. Petitioner argues that Dr. Knast "evaluat[ed] the [p]etitioner, perform[ed] neuropsychological testing, prepar[ed] a report and testif[ied]." Pet'r's Mot. 21. Respondent initially objected "because [D]r. Knast treated Mr. Sabella and, therefore, [D]r. Knast should be compensated as a fact witness only." Sabella, 2008 WL 4426040, at *36. The special master found that Dr. Knast was "retained in the context of litigation" and was not a fact witness. Id. The special master also determined that, as a specialist in learning disorders, "[D]r. Knast's testimony was important and useful" and that "[D]r.

30

Knast is entitled to compensation as an expert witness." Id. Mr. Sabella, however, failed to provide information explaining the basis of Dr. Knast's fee. Id. at *37. The special master determined that $160 was a reasonable hourly rate for Dr. Knast because "it appears to represent the amount that [D]r. Knast charges" and "because it is less than the amount that is awarded to Dr. Poser, a neurologist [with a medical degree]." Id. Mr. Sabella provided no information about the number of hours Dr. Knast spent working on the case and the special master therefore determined that 12 hours was a reasonable number of hours for the activities performed by Dr. Knast. Id. ("This entry may be on the lower end of reasonable, but Mr. Sabella could have avoided a reduction by providing invoices from [D]r. Knast that explain the number of hours for each task."). The special master awarded 12 hours at $160 per hour, a total of $1,920.00, in reasonable costs. Id.

Petitioner argues that "[a]n award of $1920 is not even adequate to obtain an evaluation and testing, let alone reports, review of records and testimony." Pet'r's Mot. 21. Calling the special master's award "absurd," petitioner contends that the hourly rate of $160 set by the special master is arbitrary and that "[f]rom Mr. Korin's billing records, it can be determined that [D]r. Knast met with counsel on several occasions, and his testimony confirmed the time he spent evaluating the Petitioner." Id. According to petitioner, justifying the $160 rate by noting that "it is less than the amount that is awarded for Dr. Poser, a neurologist," Sabella, 2008 WL 4426040, at *37, "is an amazing 'Catch-22,'" Pet'r's Mot. 21 ("The special master reduced Dr. Poser's hourly rate well below another comparable neurologist, Dr. Kinsbourne, and then he used that figure to arbitrarily set a low rate for [D]r. Knast."). The special master did not consider the hourly rate charged by Dr. Kinsbourne in determining Dr. Poser's hourly rate. See Sabella, 2008 WL 4426040, at *33. The special master determined Dr. Poser's hourly rate by looking at the rate awarded to Dr. Poser in a prior case in the Vaccine Program. Id. The special master assigned Dr. Knast the $160 per hour rate because "it appears to represent the amount that Dr. Knast charges." Id. at *37. The special master also supported, in part, the reasonableness of the rate "because it is less than the amount that is awarded to Dr. Poser, a neurologist." Id.

Mr. Sabella failed to submit information "explain[ing] the basis of [D]r. Knast's fee" and "Mr. Sabella did not provide invoices from [D]r. Knast." Id. Petitioner argues that "the documentation for Dr. Rubin's charges are exactly the same as the documentation provided for [D]r. Knast's charges, so the special master was clearly willing to accept such documentation and should have done so for the amounts that were paid to [D]r. Knast." Pet'r's Mot. 21-22. The special master noted that "[i]t certainly would be better to have invoices from Dr. Rubin," but found that "there is some basis for awarding compensation for Dr. Rubin's activities." Sabella, 2008 WL 4426040, at *38 (noting that "Dr. Rubin has charged time for writing reports and the reports are in the

31

record" and that "Dr. Rubin appeared before the undersigned").  With respect to Dr. Knast, on the other hand, the special master found that "[a]lthough the notes on Mr. Korin's ledger provide some information about the tasks performed by [D]r. Knast, there is no information about the amount of time a particular activity took."  Id. at *37.  Where petitioner has failed to provide adequate documentation to support the costs petitioner claimed, the court finds no abuse of discretion in the special master's determination.

7.    Dr. Allen Rubin

Mr. Sabella requested $4,125 for work performed by Dr. Rubin.  Sabella, 2008 WL 4426040, at *37.  The special master again found that Mr. Sabella neglected to provide "any basis to determine either Dr. Rubin's reasonable hourly rate or the reasonable number of hours."  Id.  The special master noted that Mr. Sabella's only documentation "consists of entries on Mr. Korin's ledger" and that the ledger "shows that Dr. Rubin was paid for writing three reports."  Id. at *37-38.  The special master also noted that Dr. Rubin is board certified in both psychiatry and neurology, id. at *37, saw Mr. Sabella on a number of occasions, id. at *38, wrote three reports concerning Mr. Sabella, id., and "testified for approximately two hours," id.  The special master award the full $4,125 in reasonable costs.  Id. ("It certainly would be better to have invoices from Dr. Rubin.  Nevertheless, there is some basis for awarding compensation for Dr. Rubin's activities.").  Petitioner has no objections to the amount of this award.  Pet'r's Mot. 21.

8.    Dr. David Condoluci

Mr. Sabella requested $1,800 for work performed by Dr. Condoluci.  Sabella, 2008 WL 4426040, at *38.  Dr. Condoluci treated Mr. Sabella prior to April 2001 and testified as an expert on September 15, 2006 "for slightly more than two hours."  Id. at *38-39.  The special master stated that "the problem again is that Mr. Sabella did not provide any invoices or other material from Dr. Condoluci."  Id. at *39.  The special master awarded $1,200 in reasonable costs because of the "absence of better information from Dr. Condoluci."  Id.

Petitioner states that "$1800 is a ridiculously low amount of money for a doctor who spent the time meeting with counsel, writing a report and testifying in court."  Pet'r's Mot. 22.  However, petitioner has only himself to blame for the reduction from the amount requested for Dr. Condoluci's work.  Petitioner argues that "the special master accepted the documentation for Dr. Rubin, [but] . . . ignored the same documentation for Dr. Condoluci."  Id.  Petitioner's comparison of the differing amounts awarded to Drs. Rubin and Condoluci is unavailing.  Some documentation regarding the preparation of three reports was provided with respect to Dr. Rubin.  See Sabella, 2008 WL 4426040, at

*38 ("Mr. Korin's ledger shows that Dr. Rubin was paid for writing three reports."). If Dr. Condoluci's work was awarded "a ridiculously low amount," Pet'r's Mot. 22, it was within the power of petitioner to provide documentation to support a different outcome. Where petitioner has failed to provide adequate documentation to support the costs claimed, the court finds no abuse of discretion in the special master's determination.

9.      Unnamed Individuals

Mr. Sabella requested approximately $3,100 for work performed by an unnamed expert.  Sabella, 2008 WL 4426040, at *39.  The special master held that "[w]ithout any information about the person, it is impossible to determine whether the requested fee is reasonable" and denied the amount entirely.  Id.

Petitioner argues that the special master should not have denied compensation for work by an expert who has not been identified.  Pet'r's Mot. 22-23.  "When counsel, such as Mr. Korin, represents to the Court that he has expended these funds in the furtherance of his client's case, then his word, as an officer of the Court, should be sufficient."  Id. Petitioner also notes "a real need to protect these doctors from unnecessary exposure in the event that they are not, in fact, called upon to prepare a report or testify."  Id. at 23.  In order to determine reasonable costs, the special master needs information concerning, among other things, an expert's qualifications, the cost of living in the expert's geographic area, and what fees an expert usually charges.  See Baker, 2005 WL 589431, at *1; Wilcox, 1997 WL 101572, at *4.  No such information was provided in this case. It is unnecessary for the court to decide whether it is necessary in all cases to reveal the name of the expert in order to support an award.  It was not an abuse of discretion for the special master to have denied compensation for an unnamed individual in this case.

C.      Additional Costs

Respondent objected to four additional costs claimed by Mr. Sabella:  (1) compensation for Dr. Mark Greenspan, a consultant; (2) uncategorized costs, including travel expenses; (3) printing costs; and (4) costs for paralegal travel.  Sabella, 2008 WL 4426040, at *40.  Respondent did not object to a fifth type of "miscellaneous" additional costs, claimed for "some other items such as postage and photocopying," and the special master awarded the claimed amount of $5,916.37 in full.  Id.  In total, Mr. Sabella requested $28,406.37 in additional costs and the special master awarded $10,497.28.  Id. at *44.

1.      Dr. Mark Greenspan

33

Mr. Sabella requested approximately $13,000 for work performed by Dr. Greenspan. Id. at *40. The special master included a chart in his decision showing the reasonable number of hours and reasonable hourly rate for each of the activities performed by Dr. Greenspan. Id. at *42. The special master determined that the 12.75 hours claimed for time spent by Dr. Greenspan "creating and reviewing a chronology of medical records" was unnecessary and not compensable. Id. at *40 (finding that the work had already been done by personnel at Mr. Korin's firm). The special master also determined that 9.75 hours spent gathering articles cited in Dr. Poser's bibliography could have been done by a paralegal and should only be compensated at a rate of $100 per hour. Id. The special master then determined that Dr. Greenspan would be compensated at $200 per hour for time spent "assist[ing] . . . attorneys in preparing for a meeting among the attorneys, Mr. Sabella, his mother, and at least one expert witness" in August of 2006, id. at *41, but found no reason for Dr. Greenspan to have participated in the meeting himself and awarded no compensation for this time, id. ("Attorneys do not typically request compensation for a consultant to assist the attorney in preparing a witness to testify."). The special master also determined it would be reasonable to compensate Dr. Greenspan at a rate of $175 per hour for the 3.25 hours he spent finding articles on chronic fatigue syndrome. Id. Because the special master found that Dr. Greenspan likely used his medical knowledge to write a letter for the attorneys on "positive rechallenge," he determined that $200 per hour would be a reasonable rate for this work. Id. at *42. The special master awarded a total of $2,950.00 in reasonable costs. Id. at *42.

Petitioner argues that "each review [of records] is critically important" and that as both a doctor and a lawyer Dr. Greenspan "is able to see things in the medical records that paralegals, nurses and lawyers do not." Pet'r's Mot. 23. According to petitioner, "A medical/legal consultant, like Dr. Greenspan, is invaluable for analyzing medical records and finding details that are critical to the presentation of the legal case." Id. at 24. The special master carefully analyzed the work performed by Dr. Greenspan. See Sabella, 2008 WL 4426040, at *40-42. The special master's decision includes a chart showing the special master's determination of the reasonable hours and hourly rates for each activity claimed by Dr. Greenspan. Id. at *42. Given the careful analysis undertaken by the special master and the numerous reasons articulated for his determinations, the court does not find that the special master abused his discretion in awarding only a part of the compensation requested for work performed by Dr. Greenspan.

2.     Travel Expenses

Mr. Sabella requested approximately $4,000 in "uncategorized costs," some of which were for travel. Id. at *43. The special master rejected these costs, with two

exceptions.  Id.  The special master awarded $182.00 for a stay at a Doubletree hotel in Mt. Laurel, New Jersey on August 18, 2006, and $252.41 for a stay at a Holiday Inn in September 2006.  Id.  During the August stay Mr. Sabella's counsel met with Mr. Sabella and his treating doctors to prepare for the hearing.  Id.  The September stay coincides with the hearing held in September 2006.  Id.  The special master found that the documentation explaining the other items was inadequate and that expenses at certain hotels and restaurants were "more expensive than reasonable."  Id.  With respect to petitioner's uncategorized costs, including travel costs, the special master awarded a total of $434.41 in reasonable costs.  Id.  Petitioner did not address this determination in petitioner's Motion for Review.  See Pet'r's Mot. passim.

3.     Printing Costs

Mr. Sabella requested $1,196.50 in printing costs.  Sabella, 2008 WL 4426040, at *43.  The special master awarded this amount in full.  Id.  Petitioner did not address this determination in petitioner's Motion for Review.  See Pet'r's Mot. passim.

4.     Costs for Paralegal Travel

Mr. Sabella requested over $1,400 for time spent, and costs incurred, by Elizabeth K. Margolis, a paralegal in Mr. Korin's firm, while accompanying Mr. Sabella on a trip to see Dr. Pretorius.  Sabella, 2008 WL 4426040, at *44.  The special master denied these costs entirely.  Id. ("Paralegals are trained to assist attorneys with legal matters. Accompanying a patient on an overnight trip to see a doctor is not using paralegal skills.").  Petitioner did not address this determination in petitioner's Motion for Review. See Pet'r's Mot. passim.

D.     Total Amount of Costs and Fees

The special master awarded a total of $62,207.50 in attorneys' fees and $17,742.28[8] in costs.  Sabella, 2008 WL 4426040, at *45.  The court increases the award for attorneys' fees by $1,690.00 for time spent preparing the Motion for Review considered in this opinion.  See supra Part III.A.2.e.  Petitioner is therefore awarded $63,897.50 in attorneys' fees.  The court increases the award for costs as follows:

---

[8] The special master's total of $17,742.28 ($7,245 + $10,497.28) in costs is the result of a mathematical error.  See Sabella, 2008 WL 4426040, at *39, 44.  The correct amount is $24,012.28 ($13,515.00 + $10,497.28).  See id.

1.      The award for costs is increased by $6,270.00 to account for a mathematical error, <u>see</u> <u>supra</u> note 5;

2.      The award for costs is increased by $625.00 resulting from a $50 per hour increase in Dr. Shoenfeld's hourly rate, <u>see</u> <u>supra</u> Part III.B.3; and

Petitioner is therefore awarded $24,637.28 in costs.

IV.     Conclusion

For the foregoing reasons, petitioner's Motion is GRANTED-IN-PART and DENIED-IN-PART.  The decision of the special master is REVERSED in so far as it (1) denied certain costs due to a mathematical error and (2) improperly reduced Dr. Shoenfeld's hourly rate by $50 per hour.  The decision of the special master is AFFIRMED in all other respects.  The Clerk of the Court shall enter judgment in the amount of $62,897.50 for attorneys' fees and $24,637.28 for costs.  No costs.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge